# UNITED STATES ET AL. v. MORGAN, ADMINISTRATRIX, ET AL.

No. 640.   Argued April 10, 1941.—Decided May 26, 1941.

*Attorney General Jackson,* with whom *Assistant Attorney General Berge,* and *Messrs. Hugh B. Cox, Warner W. Gardner, James C. Wilson, S. R. Brittingham, Jr.,* and *G. N. Dagger* were on the brief, for appellants.

*Messrs. John B. Gage* and *Frederick H. Wood,* with whom *Mr. Thomas T. Cooke* was on the brief, for appellees.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This case originated eleven years ago. As a result of proceedings begun in April, 1930 under the Packers and Stockyards Act, 42 Stat. 159, 7 U. S. C. § 181 *et seq.*, the Secretary of Agriculture in June, 1933, issued an order setting maximum rates to be charged by market agencies for their services at the Kansas City Stockyards. The market agencies brought suit to set aside his order. The district court issued a temporary restraining order, under which amounts charged in excess of the rates fixed by the order were impounded, and later it upheld the order. 8 F. Supp. 766. On appeal here, 7 U. S. C. § 217; 28 U. S. C. §§ 44, 47a, the case was sent back to the district court in order to determine on the issues raised by the pleadings whether the agencies had been denied the "full hearing" demanded by § 310 of the Act. 298 U. S. 468. The district court thereupon decided that this requirement of the statute had been satisfied. 23 F. Supp. 380. The case was again brought here and the order of the Secretary

was held invalid because of procedural defects. 304 U. S. 1. Prior to this decision, the Secretary and the market agencies had agreed upon a higher schedule of rates to become effective on December 1, 1937. However, under the impounding order, which had continued in effect until that date, over half a million dollars had been deposited. The disposition of this fund was made a ground for a petition for rehearing after the second *Morgan* decision, but the petition was denied because that question was for the district court. 304 U. S. 23, 26. The Secretary then reopened the original proceedings to determine reasonable rates during the impounding period. Before the Secretary had made a new order, the district court directed that the impounded moneys be turned over to the market agencies. 24 F. Supp. 214. The case came here for the third time, and we reversed the district court and required its retention of the fund "until such time as the Secretary, proceeding with due expedition, shall have entered a final order in the proceedings before him." 307 U. S. 183, 198. This decision was rendered on May 15, 1939. A month later, the Secretary issued a new schedule of rates for the impounding period based on elaborate findings. Accordingly, the Government moved the district court to distribute the funds in accordance with the Secretary's order, but that court, with one of its three judges dissenting, held the order invalid and directed that the funds be given to the market agencies. 32 F. Supp. 546. The case is now here for the fourth time.

The validity of the Secretary's order has undergone the closest scrutiny in elaborate briefs and extended oral arguments. Nothing has been overlooked. However, in the final stage of this long drawn out litigation, critical examination reveals only a few issues demanding attention.

When the matter was last here we defined the duty of the Secretary. He was to determine reasonable rates for the impounding period so that there could be just dis-

tribution of the funds which the court below had taken into its registry. The nature of the problem before the Secretary was a guide to its solution. The Secretary's task was not the usual enterprise of fixing rates for the future, so largely an exercise in prophecy. Unique circumstances made him, in 1939, the arbiter of rates for a period between 1933 and 1937. But even such a retrospective determination does not present a mathematical problem. Doubts and difficulties incapable of exact resolution confront judgment. More than that, since the Secretary is the guardian of the public interest in regulating a business of public concern it is not for him merely to reflect the items on a profit and loss statement. He must consider whether these represent services which properly should be charged to the public. While, therefore, the Secretary in determining rates for the past could not deny himself the benefit of hindsight, he was not merely a bookkeeper posting items into a ledger. Rates to which these public agencies were entitled were not to be derived merely from their expenditures and actual income.

This Court defined the duty of the Secretary in its decision in the 307th U. S. The record leaves no doubt that the Secretary, when he filed his order a month after that decision, appropriately discharged the duty. He served upon the market agencies the order of June 14, 1933, and the findings underlying it as the starting point of the inquiry. The market agencies protested against any order *"nunc pro tunc* as of June 14, 1933," alleged that conditions had changed much since 1933, and asked for the appointment of an examiner to take new evidence. Because he deemed the earlier findings illuminating and helpful "as a working basis for this hearing," the Secretary refused to withdraw them. But he appointed an examiner to hear new evidence and denied "any intention of depriving the respondents of the opportunity of offering evidence concerning conditions affecting the reasonableness of their

rates during the period subsequent to June 14, 1933." He further stated that the "forecasts of conditions" in the 1933 order "can now be checked in light of subsequent events." He neither purported to make nor did he make a *nunc pro tunc* order. The Secretary thus adopted a procedure which admitted whatever light was shed by change of circumstances after 1933. The market agencies freely availed themselves of this procedure; and the Secretary's findings leave no room for doubt that his conclusions represent a judgment of 1939 and not a prophecy of 1933. Having overruled the contention of Government counsel that evidence of conditions after 1933 was irrelevant, he took note of the fact that fewer livestock came to the market after 1933; that a larger number came by truck, thereby causing a decrease in the number of animals in an average consignment; that specific as well as general economic factors touching the market at Kansas City had changed; that statistics relevant in 1933 had become outmoded; and that he had before him evidence of expenses for "business getting and maintaining" and salesmanship not before him in 1933. The Secretary thus unequivocally avowed his intention to consider conditions after 1933 and his findings carry out his purpose.[1] We must therefore reject the claim that the Secretary's judgment was founded on the misconception that he must shut his mind to everything that happened after 1933 and in 1939 fix rates in the imaginary world of 1933.

Another attack upon the Secretary's order is the con-

[1] Attention is called to the title page of the tentative findings, on which appeared, opposite the docket number of the case and the names of the formal parties, the words "Tentative Findings of Fact, Conclusions and Proposed Order, issued as of June 14, 1933." This formal caption is not an unnatural description of the starting point of the Secretary's new inquiry. It clearly is not descriptive of his final findings and order, let alone a denial of the proper theory on which he avowedly proceeded.

ventional objection that the findings were not rooted in proof. To reëxamine here with particularity the extensive findings made by the Secretary, and to test them by a record of 1340 printed pages and thousands of pages of additional exhibits, would in itself go a long way to convert a contest before the Secretary into one before the courts. Compare *Litchfield* v. *Register and Receiver,* 9 Wall. 575, 578. We have canvassed too fully in the past the duties respectively allotted to the Secretary of Agriculture and the courts in the enforcement of the Packers and Stockyards Act to justify extended discussion of the governing principles. *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420; *Acker* v. *United States,* 298 U. S. 426; see also *United States* v. *Morgan,* 307 U. S. 183, 190–91. We are in the legislative realm of fixing rates. This is a task of striking a balance and reaching a judgment on factors beset with doubts and difficulties, uncertainty and speculation. On ultimate analysis the real question is whether the Secretary or a court should make an appraisal of elements having delusive certainty. Congress has put the responsibility on the Secretary and the Constitution does not deny the assignment.

The objection that the proof does not support the findings is really a repetition in disguise of the unfounded claim that the Secretary misconceived his duty and made his order in 1939 as though he were acting in 1933. The bedrock of these variously phrased attacks upon the order is the contention that the Secretary was indifferent to events occurring after 1933. The short answer is that he was not. The conclusion which he drew from these events is another matter.[2]

---

[2] That inferences from facts and contentions regarding their significance are the real stuff of these rate determinations is well illustrated by the phase of the problem before the Secretary that was most strongly pressed upon us. It is undisputed that since 1933 the arrival of animals by truck has increased, thereby causing a decrease

Specifically, it is urged that by the increase of rates for the future, to which the market agencies and the Secretary agreed in 1937, changes in circumstances were recognized, while the present order ignored these changes because its rates are at the same level as the original order. But the Secretary did not disregard changed market conditions during the impounding period. Evidence showing these changes was submitted by the market agencies.[3] He was thus duly apprised of the changes and

in the average number of animals in a consignment. And since the consignment is the unit of cost, a decrease in the number of animals results in an increase in cost per head in the consignment. Hence, formal logic concludes, the present order in setting the same rates as those of 1933 fails to reflect this increase in per head cost, and on that ground is invalid. But both the 1933 and 1939 schedules recognize that there are minimal costs unrelated to the number of animals in a consignment. Both orders, therefore, were graduated according to the number of animals in a consignment. The Secretary found that this graduated scale which "produces an increasing per head revenue as the number of head in the consignment decreases" would "give recognition to the changing method of arrival of livestock." Moreover, the decrease in the size of consignments may well have been reflected in the increased estimate of salesmanship cost. All these considerations only illustrate that we are moving in a difficult and specialized realm of judgment which has been entrusted to the Secretary of Agriculture and not to the courts. The Secretary's judgment must prevail since his finding had the support of inferences fairly drawn from the entire evidence, including all that the market agencies saw fit to introduce bearing on their operations after 1933.

[3] An objection to an exclusion of evidence by the examiner requires but slight comment. Two coöperative commission companies had accepted the rates of the Secretary's order of 1933, and the market agencies asked that the annual reports of these companies for the impounding period be produced by the division of the Department of Agriculture with which they were filed. The examiner refused to order production of the reports on the ground that he had no authority to do so, basing his ruling on a section which the Packers and Stockyards Act incorporates from the Federal Trade Commission Act and which provides that it shall be a misdemeanor for any

they entered into the findings. To be sure, in ascertaining the reasonable rates for the impounding period he did not attach to them the significance which the market agencies drew from them. As a result of an elaborate study of conditions prior to 1933 and evidence indicating no essential change in those conditions for the purpose at hand during the later years, the Secretary concluded that the market w overstaffed and that in the competitive setting of the business amounts had been spent not justified by that public interest which he is charged to protect. Actual expenses for salesmen's salaries and "business getting," the items chiefly in controversy, he found, did not furnish an adequate guide to the ascertainment of reasonable rates. Had the lower rates originally set by the Secretary in 1933 been tested by experience, audits of the market agencies under these rates would have reflected the practical operation of the policy of lowering costs under controlled conditions. But this source of experience was unavailable because the agencies throughout the impounding period continued to operate under the higher rates. Quite different considerations may properly have influenced the Secretary in fixing rates for the impounding period from those by which he determined a schedule of rates for the future. The existence of the differences is recognized in the agreement between the Secretary and the market agencies whereby the higher rates of the 1937 schedule were to be "without prejudice" either to the Government or to the agencies

officer of the regulatory agency to make public any information which the agency has obtained "without its authority, unless directed by a court." 7 U. S. C. § 222, 15 U. S. C. § 50. We need not determine whether the reports should properly have been admitted. If they should have been, the statute provides an orderly way for having this done during the course of the hearing by seeking the Secretary's authorization. Having failed to pursue the way of the statute, the market agencies were debarred from raising the matter at a later time.

in the present litigation. It was further agreed in 1937 that after six months, and unless the rate order of 1933 was found invalid, the Secretary could at any time "without further hearing" reduce the rates for the future to the 1933 level. There were very great complexities in determining rates for an industry affected by the unstable conditions which surrounded the Kansas City market in 1937. And the expert tribunal charged with the task may well have felt a need for flexibility in the prophecy involved in setting future rates which did not enter the judgment required in fixing rates for a past period. It is not for us to try to penetrate the precise course of the Secretary's reasoning. Our duty is at an end when we find, as we do find, that the Secretary was responsibly conscious of conditions at the market during the years following 1933, that he duly weighed them, and nevertheless concluded that rates similar to those in the 1933 order were proper.

But the market agencies go beyond saying that the record did not warrant what the Secretary found. They say that bias disqualified him. This serious charge derives from a letter written by the Secretary to the *New York Times* immediately following the decision of this Court in the second *Morgan* case, 304 U. S. 1. By that decision, the Court had upset the order of 1933 because of procedural defects. Largely because of his assumption that this meant the return of the impounded funds to the market agencies, the Secretary in his letter vigorously criticized the decision. The market agencies in due course moved to disqualify the Secretary in the proceedings started by him to fix new rates. In denying their motion the Secretary wrote a patently sincere denial of bias. He stated that he had complained against a return of the impounded funds to the market agencies prior to a determination of the rates on the merits, that the denial of the petition for rehearing, 304 U. S. 23, 26, had shown him the error of his assumption, that in his letter of criticism he

made no prejudgment about the rates to be fixed, and that his only concern was to "see that the substantive rights of the parties are fairly determined." He added that "as a matter of expediency" he might have disqualified himself but for the fact that, while the market agencies were pressing his disqualification, they were simultaneously urging that none other than the Secretary had legal authority to make the rate order. Plainly enough, when it was thus suggested that he create a situation in which no order could be made, the Secretary was offered no escape from his duty even had he preferred to consult the comforts of personal convenience.

But, intrinsically, the letter did not require the Secretary's dignified denial of bias. That he not merely held, but expressed, strong views on matters believed by him to have been in issue, did not unfit him for exercising his duty in subsequent proceedings ordered by this Court. As well might it be argued that the judges below, who had three times heard this case, had disqualifying convictions. In publicly criticizing this Court's opinion the Secretary merely indulged in a practice familiar in the long history of Anglo-American litigation, whereby unsuccessful litigants and lawyers give vent to their disappointment in tavern or press. Cabinet officers charged by Congress with adjudicatory functions are not assumed to be flabby creatures any more than judges are. Both may have an underlying philosophy in approaching a specific case. But both are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. Nothing in this record disturbs such an assumption.

And so we conclude that the order of the Secretary furnishes "the appropriate basis for action in the district court in making distribution of the fund in its custody." *United States* v. *Morgan,* 307 U. S. 183, 198. But, finally, a matter not touching the validity of the order requires consideration. Over the Government's objection the dis-

trict court authorized the market agencies to take the deposition of the Secretary. The Secretary thereupon appeared in person at the trial. He was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates. His testimony shows that he dealt with the enormous record in a manner not unlike the practice of judges in similar situations, and that he held various conferences with the examiner who heard the evidence. Much was made of his disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary "has a quality resembling that of a judicial proceeding." *Morgan* v. *United States,* 298 U. S. 468, 480. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that "it was not the function of the court to probe the mental processes of the Secretary." 304 U. S. 1, 18. Just as a judge cannot be subjected to such a scrutiny, compare *Fayerweather* v. *Ritch,* 195 U. S. 276, 306–07, so the integrity of the administrative process must be equally respected. See *Chicago, B. & Q. Ry. Co.* v. *Babcock,* 204 U. S. 585, 593. It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other. *United States* v. *Morgan,* 307 U. S. 183, 191.

*Reversed.*

Mr. Justice Reed did not participate in the consideration or decision of this case.

MR. JUSTICE ROBERTS:

With much that is said in the opinion of the Court I agree, but I am compelled to dissent from the conclusion. Despite the fact that this litigation has extended over many years, I still think that not only the rights of the market agencies but the principles involved require the Court to take care that the litigation is disposed of in accordance with the principles it has laid down. The result now reached is not in accordance with those principles. A recital of the course of the litigation is necessary for an understanding of the case as now presented.

Rates for the market agencies at Kansas City were fixed by the Secretary of Agriculture [1] July 24, 1923. By virtue of the statute these became the legal rates and the agencies were bound not to exceed them until the further order of the Secretary. April 7, 1930, the Secretary instituted an inquiry into the existing rates. June 14, 1933, he issued an order reducing them.

July 19, 1933, the market agencies brought suit to enjoin and set aside the order. The District Court entered a temporary injunction July 22, 1933, in connection with which it provided that the difference between the rates being charged by the agencies and those fixed by the order under attack should be impounded pending the outcome of the litigation. Upon the trial of the cause the court refused to consider an issue tendered by the agencies as to whether the Secretary had granted them a full hearing. Upon examination of the record, it held the order was supported by substantial evidence and, on October 29, 1934, dismissed the bill.[2] This Court reversed, on May 25, 1936, holding that the District Court should have con-

---

[1] Several incumbents of the office acted in the case at successive dates. The term Secretary is used to designate the official who acted in any instance.

[2] 8 F. Supp. 766.

sidered and decided the question whether the agencies had been afforded a full hearing.[3]

On a further trial the District Court again upheld the order by a decree of July 2, 1937.[4]   The United States appealed from this decree.   In the meantime, however, a significant thing occurred.   On November 14, 1937, the Secretary approved new rates, effective November 1, 1937, in recognition of changed conditions existing in the business at Kansas City.   The impounding order, therefore, ceased to operate November 1, 1937.

This Court reversed the second decree of the District Court because it found that the agencies had been denied a full hearing in the proceedings which eventuated in the order of 1933.   Its decision was rendered April 25, 1938, and a rehearing was denied May 31, 1938.[5]

The Secretary and his legal advisers evidently believed, and, as I think, correctly, that the old rates authorized in 1923 stood until a new order, lawfully made, superseded them for the future.   The rates fixed for the future by the order of 1933 had not become effective and the Act contained no provision for altering rates charged in the past under authority of the existing and outstanding order of 1923, or granting reparation in respect of them.   The Secretary seems to have thought that he could reach this situation by the entry of a *nunc pro tunc* order *as of* July 14, 1933.   On June 2, 1938, therefore, he directed that the proceeding be reopened and that the "proceedings, findings of fact, conclusion and order" issued on June 14, 1933, be served upon the agencies as the "Tentative Findings of Fact, Conclusion and Proposed Order" of the Secretary, and he denominated them as "Tentative Findings of Fact, Conclusion, and Proposed Order" *issued as of June 14, 1933.*   It is plain that he proposed thus to cure what had

---

[3] 298 U. S. 468.
[4] 23 F. Supp. 380.
[5] 304 U. S. 1, 23.

been found to be the defect in the order, by affording the market agencies an opportunity to file and argue exceptions, in an effort to show any infirmity in the findings and conclusion on which the 1933 order was based. If none was made to appear, he proposed to issue the order *nunc pro tunc* as of its original date. It is true that after exceptions were filed, and upon the hearing before an examiner, the agencies were permitted to offer evidence to show changed conditions supervening in the period between 1933 and 1937. It is also true that, while the examiner retained all of the findings previously made as the foundation for the order of 1933, he added certain findings, but he did not, in any material respect, alter the ultimate findings and, indeed, he retained the exact rates fixed in the earlier order and left undisturbed every finding as to cost (with one immaterial exception), even to the fourth decimal place, as it had stood in the original report.

Immediately after the reopening of the proceeding consequent upon the decision of this Court of May 31, 1938, the Secretary, on June 12, 1938, applied to the District Court for an order staying the distribution of the impounded funds, pending his further decision and order. In his petition he said: "After a full hearing the Secretary will determine by an order as of June 14, 1933, what rates may reasonably be charged by petitioners to their clients for the services rendered them." The District Court denied the application.[6]

The United States appealed from the decree. In its brief it stated "The only purpose and effect . . . [of the reopened proceeding] is to determine whether and to what extent the appellees have been prejudiced by the procedural defect in the earlier proceeding."

Before the case had been decided here, the reopened proceeding before the Secretary had so progressed that

---

[6] 24 F. Supp. 214.

the evidence had been closed, a tentative report made by an examiner, exceptions filed, and argument heard by the Secretary. The record plainly discloses that, up to the time of our final decision on this last appeal, the Secretary had been content to take the data disclosed by his investigation of the market agencies' activities in the years 1929, 1930 and 1931 as the basis of any order, and this was natural if, as he then supposed, he was justified in entering an order *nunc pro tunc* as of the date of his original 1933 order.

This Court rendered its opinion in the last appeal May 15, 1939.[7] Speaking by a majority, the Court there held that, as the District Court was acting as a court of equity in the premises, the impounded funds should be disbursed according to the equities of the situation. It adverted to the fact that the rates fixed by the Secretary October 14, 1937, governed for the future until altered in accordance with law, but it held that the equities of the case required an investigation as to whether the rates charged in the interval between 1933 and 1937 had been unreasonable and, as a result, whether it would be inequitable to withhold from the market agencies' customers and return to the market agencies all or any part of the impounded fund. The court was of the view that the Secretary was in a peculiarly favorable position to find the facts and advise the court upon this subject and that the court ought to coöperate with the Secretary to attain a just result.

At this juncture the reopened proceeding was under submission before the Secretary. It is to be noted that he had refused to consider the data in his own possession with respect to the actual experience of two of the market agencies which had conformed to the rates he fixed in 1933. It is further to be noted that the existence of

[7] 307 U. S. 183.

changed conditions not only is shown by the uncontradicted evidence offered by the agencies but by the fact that the Secretary recognized such change in making his order of October 14, 1937.

The court below has found that conditions in the business had substantially, and in some respects radically, changed since the completion of the original record on which the 1933 order was based. The court found the facts as to the changes which had increased the cost of doing the business. The government does not question the correctness of these findings. I think these increased costs cannot be ignored or dismissed with the comment that the Secretary considered them, when it is plain he did not. This Court did not intend by its decision in 1939 that the Secretary should shut his eyes to these changed conditions, and make a forecast in 1939 *as of 1933* and upon the data available in 1933, as if he had before him only the experience prior to 1933 and were then acting. Of a similar situation this Court has said: "A forecast gives us one rate. A survey gives another. To prefer the forecast to the survey is an arbitrary judgment." [8]

The Secretary had made a careful investigation of the operations of the market agencies in the years prior to 1933. The same data were available to him in 1939 for the period 1933 to 1937, but were not considered. What he should have done, in the light of this Court's decision, was again to reopen the cause and to investigate the fairness and reasonableness of the charges exacted from 1933 to 1937, in the light of actual experience. To assert that he did in fact pursue this course is to place an unjustified gloss upon the record now before the Court.

We ought not to conclude the parties by a strained construction of the record facts, or by applying to this

---

[8] *West Ohio Gas Co.* v. *Public Utilities Commission,* 294 U. S. 79, 82.

inquiry technical rules of evidence and procedure which have no place in such a proceeding. On the contrary, we should require that to be done which the broad equities of the case demand. No less, it seems to me, will satisfy the mandate of this Court in its earlier pronouncement. I should, therefore, reverse the decree and direct that the Secretary ascertain the facts upon all available evidence, in accordance with the decisions of this Court when the case was last here.