9 N.J. Super. 124 (1950)
75 A.2d 284
IN THE MATTER OF THE ARBITRATION BETWEEN NEW JERSEY BELL TELEPHONE COMPANY, A CORPORATION OF NEW JERSEY, APPELLANT ON APPEAL, AND COMMUNICATIONS WORKERS OF AMERICA, NEW JERSEY TRAFFIC DIVISION NO. 55, CIO, RESPONDENT ON APPEAL, AND BOARD OF ARBITRATION CONSTITUTED UNDER CHAPTER 38, LAWS OF 1946; CHAPTERS 47 AND 75, LAWS OF 1947; CHAPTER 308, LAWS OF 1949 AND CHAPTER 14, LAWS OF 1950, AND WILLIAM HOPE MARTIN, PUBLIC MEMBER AND CHAIRMAN OF SAID BOARD; ARTHUR LESSER, JR., PUBLIC MEMBER OF SAID BOARD; ARTHUR R. LEWIS, PUBLIC MEMBER OF SAID BOARD; WILLIAM DUNN, LABOR MEMBER OF SAID BOARD; AND HAROLD W. LORD, INDUSTRY MEMBER OF SAID BOARD, AND THE NEW JERSEY STATE BOARD OF MEDIATION IN THE DEPARTMENT OF LABOR AND INDUSTRY, ADDITIONAL RESPONDENTS ON APPEAL.
Superior Court of New Jersey, Appellate Division.
Argued June 26, 1950.
Decided August 10, 1950.
*127 Before Judges McGEEHAN, COLIE and EASTWOOD.
Mr. Thomas Glynn Walker argued the cause for the appellant (Messrs. Joseph Weintraub, Frederick W. Nixon, Frank P. Combs and F. Mark Carlinghouse (of the New York Bar), on the brief).
Mr. Israel B. Greene argued the cause for the respondent (Messrs. Greene & Hellring, attorneys; Messrs. Bernard Hellring and Henry Mayer (of the New York Bar), of counsel).
The opinion of the court was delivered by EASTWOOD, J.A.D.
This is a renewal of the motion made by the appellant, New Jersey Bell Telephone Company (hereinafter referred to as "telephone company"), for leave to take additional testimony under Rule 3:81-9, based on two affidavits of Mr. Harold W. Lord, the telephone company's appointee to the Board of Arbitration. Subsequent to the filing of the Board's findings of fact, the telephone company made such an application and this court denied the motion without prejudice to its renewal at the argument of the appeal.
The telephone company argued the motion in its main brief on appeal under point three on the assumption that the proof sought to be offered through its motion to take additional testimony, and based upon the facts contained in Mr. Lord's affidavits, is true. It is obvious from an examination of the reasons advanced for the taking of additional testimony *128 that the motion involves some of the questions necessarily to be decided on the main appeal. Consequently, they will be dealt with in the opinion of the court disposing of those and other issues raised on the appeal itself. We proceed to a discussion of those aspects of the motion disposed of by this opinion.
Under Point III (a) in its appeal brief, the company asserts:
"The Findings of Fact, Decision and Order were not the result of Board action, but rather were made by three members of the Board acting individually and without permitting participation therein by the remaining members of the Board."
We find no support in the affidavit of Mr. Harold W. Lord, the company's representative on the Board, for these assertions; therefore, there is no justification for taking additional testimony with respect thereto. The findings of fact and decision filed by a majority of the Board recites that "Following a recess for the study of the record and the exhibits submitted by the parties, the Board convened to consider the matters on April 10th and continued its discussions until April 18th. The Order resulting from such deliberation was delivered to the Governor and released on April 20th. The following are our findings of fact and decision with respect to the matters submitted to the Board." It is obvious that the order signed by all of the members under date of April 19, 1950, determining the issues between the parties, resulted from the specific conclusions of the Board members, the labor and industry members indicating their dissents as to certain "items" determined thereby. It is significant that the order, signed by Mr. Lord and the other four members, recites that "the board held public hearings at which both parties were represented by counsel and presented evidence on the issues in controversy. After due consideration of the evidence submitted, and of the arguments on behalf of the respective parties, the board of arbitration promulgates the following order." Mr. Lord, in his affidavit in support of the motion, states that "After meeting together a half day on Saturday, April 15th, *129 the public members then met with the labor member and me and presented us with their conclusions. I objected to the conclusions from which I dissented in the Order. The labor representative objected to certain conclusions. The discussions which followed resulted in little change from those conclusions so reached by the public members in private session." At that session, Mr. Lord admits that he succeeded in obtaining two concessions from the majority. It is clear that both the industry and labor members of the Board received a copy of the majority's written findings of fact prior to the filing thereof, as indicated by their dissenting findings of fact dated and filed on May 25, 1950, on which date the majority's findings of fact were also filed. Under the pertinent statute, a majority of the Board may determine the issues. Having done so, as here, the majority acted within the scope of their authority when they took the necessary steps to prepare the written form of their findings of fact. We see no error in their meeting in separate sessions for that purpose. The irregularity, if any, was in the majority's failure to comply with the statute by filing their findings of fact forthwith. This question is dealt with in the main opinion. We think it is clear from the record that the entire Board met and discussed the majority findings of fact, and that no good purpose could be served by taking additional evidence with respect thereto.
It would be improper to permit the telephone company to take proofs that the Communications Workers of America (CIO), announced that it would not seek wage increases for the employees represented by it, including members of the union involved in this litigation, but would combine its efforts in entering into contracts with other Bell System Companies providing for a shortening of wage progression schedules and other changes in said contracts not related to wage increases. This announcement was subsequent to the conclusion of the hearings in question and assuming the truth of the assertion, even if admitted, it could have no relevancy or effect upon the determination reached by the Board of *130 Arbitration. The foregoing comment applies to other evidence that the telephone company desires to take, viz.: that a number of Bell System Companies throughout the United States have executed or are about to execute with local CWA (CIO) union contracts as described in paragraph two.
Nor do we find any necessity to take further proof that appellant is engaged in interstate commerce. The union concedes that to be the fact. Certainly, no additional evidence could be taken to establish that the statute in question invades a field pre-empted by the Federal Government. This is purely a legal question and will be dealt with in the opinion deciding the main issues.
Under Point III (c) the company alleges:
"The Board violated the statute and denied a fair hearing in that it was influenced by a desire to set a national pattern for the settlement of labor disputes in the telephone industry elsewhere in the United States; in that it obtained and considered matters not in the record, and in that it considered incompetent and irrelevant evidence offered at the hearing."
The telephone company characterizes the action of the majority members as "errors of law" committed "in the conduct of the hearings, in its deliberations, and in the making of its findings of fact and decision, and its order." A careful reading of the record convinces us that the telephone company's arguments actually represent different viewpoints between the majority and dissenting members of the Board. The criticism of the majority Board's conduct centers largely on their differences with the telephone company's representative in the analysis, interpretation and construction to be placed upon and given to the evidence adduced before the Board. It is evident that the cases cited by the company in its attempt to justify the taking of additional proofs were concerned with charges characterized as "misconduct," whether intentional or unintentional, quite contrary to the character of the allegations made here.
The union contends that to grant the motion of the telephone company would result in an exploration of the mental *131 processes of the members of the Board. The telephone company concedes that it has no right to examine the members of the Board as to how they reasoned or as to what weight they gave certain matters. It contends "that the irregularities in question vitiate the order without any inquiry as to whether the irregularities had a deleterious effect upon "the thinking or conclusions of the members of the Board. At the outset, the question of permitting the taking of additional proofs by interrogating the members of the Board is one fraught with real dangers. If such a policy were adopted, it is conceivable that it might be difficult indeed to obtain outstanding individuals capable and competent to serve on such boards to undertake the performance of the duties entailed therein, realizing the possible attacks that might follow their determinations. In addition, as pointed out by the union, the establishment of such a rule of law might conceivably provoke the creation of "incidents" during the deliberations of the Board in the privacy of the conference room for the sole purpose of laying the basis for the impeachment of the award. Also, such a rule might well limit free and comprehensive discussion of the issues by the members of the Board preliminarily to reaching their conclusions. Such a situation would practically defeat the object to be achieved under the pertinent statute, viz.: the attempt to settle and determine issues of great importance not only to labor and industry, but to the public, also. The real harm that might logically follow the adoption of such a rule would be to open the door to similar attacks on the judgments of judicial tribunals. Then, "the last bulwark of democracy" would be in jeopardy. It seems to us that the conference room of quasi-judicial bodies and judicial tribunals should be regarded as places where those participating may freely, without limit, express their views on every aspect of the matter before them without the fear of a result that might occur from adopting such a rule as contended for here. The question as to how far a court should go in permitting the interrogating of members of quasi-judicial bodies, has been passed upon by the *132 United States Supreme Court in several decisions. In the case of Chicago, B. & Q.R. Co. v. Babcock, 204 U.S. 585; 51 L.Ed. p. 636, Mr. Justice Holmes, speaking for the court, stated:
"When we turn to the evidence there is equal ground for criticism. The members of the board were called, including the governor of the state, and submitted to an elaborate cross-examination with regard to the operation of their minds in valuing and taxing the roads. This was wholly improper. In this respect the case does not differ from that of a jury or an umpire, if we assume that the members of the board were not entitled to the possibly higher immunities of a judge. Buccleuch v. Metropolitan Bd. of Works, L.R. 5 H.L. 418, 433. Jurymen cannot be called, even on a motion for a new trial in the same case, to testify to the motives and influences that led to their verdict. Mattox v. United States, 146 U.S. 140, 13 Sup. Ct. Rep. 50, 36 L.Ed. 917. So, as to arbitrators. Buccleuch v. Metropolitan Bd. of Works, L.R. 5 H.L. 418, 457, 462. Similar reasoning was applied to a judge in Fayerweather v. Ritch, 195 U.S. 276, 306, 307, 25 Sup. Ct. Rep. 58, 49 L.Ed. 193, 213, 214. A multitude of cases will be found collected in 4 Wigmore on Evidence, Sections 2348, 2349. All the often-repeated reasons for the rule as to jurymen apply with redoubled force to the attempt, by exhibiting on cross-examination the confusion of the members' minds, to attack in another proceeding the judgment of a lay tribunal, which is intended, so far as may be, to be final, notwithstanding mistakes of fact or law. * * *"
In Morgan v. United States, 304 U.S. 1, 13, 82 L.Ed. 1129, it was charged that the order of the Secretary of Agriculture was made without the hearing required by the statute and the Secretary was later interrogated as to the consideration he had given to the testimony. With respect thereto, Mr. Chief Justice Hughes, speaking for the court, stated:
"In the light of this testimony there is no occasion to discuss the extent to which the Secretary examined the evidence, and we agree with the Government's contention that it was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions if he gave the hearing which the law required. * * *"
In United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429, Mr. Justice Frankfurter, speaking for the court, stated:
*133 "Over the Government's objection the district court authorized the market agencies to take the deposition of the Secretary. The Secretary thereupon appeared in person at the trial. He was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates. His testimony shows that he dealt with the enormous record in a manner not unlike the practice of judges in similar situations, and that he held various conferences with the examiner who heard the evidence. Much was made of his disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary `has a quality resembling that of a judicial proceeding.' Morgan v. United States, 298 U.S. 468, 480, 80 L.Ed. 1288, 1294, 56 S.Ct. 906. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation, that `it was not the function of the court to probe the mental processes of the Secretary.' 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129, 1132. Just as a judge cannot be subjected to such a scrutiny, compare Fayerweather v. Ritch, 195 U.S. 276, 306, 307, 25 S.Ct. 58, 49 L.Ed. 193, 213, 214, so the integrity of the administrative process must be equally respected. See Chicago, B. & Q.R. Co. v. Babcock, 204 U.S. 585, 593, 27 S.Ct. 326, 51 L.Ed. 636, 638. It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other. United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211, 1217."
In National Labor Relations Board v. Donnelly Garment Company, 330 U.S. 219, 229, 67 S.Ct. 756, 91 L.Ed. 854, 863, Mr. Justice Frankfurter, speaking for the court, stated:
"According to an early English judge, `The devil himself knoweth not the mind of man,' and a modern reviewing court is not much better equipped to lay bare unexposed mental processes. * * *"
We are satisfied that the court has unquestioned power to take testimony to ascertain the truth of charges of misconduct, whether it be fraudulent or otherwise, on the part of members of a quasi-judicial body or a judicial tribunal, when there is sufficient prima facie proof thereof. However, in dealing with immunity of members of an administrative agency from *134 interrogation such as is attempted here, the view taken by this court is well expressed in the opinion of N.L.R.B. v. Botany Worsted Mills, 106 F.2d 263 (3rd Cir., 1939), wherein the court had this to say:
"The essence of the discussion of a common cause and the judgment ensuing upon that discussion must lie in freedom of expression. If those present during the discussion are aware that their sentiments, either tentative or final, may be revealed by their fellow participants, it is clear that caution or worse would remove all candor from their minds and tongues. The logic of this position requires the preservation from questioning of each member of the general body. Each one's action or reaction is part of the common pool; to cast suspicion upon anyone of them is to muddy the general waters. To illustrate simply, if Mr. X is asked, `Did you read the record?' what is to prevent his fellow member, Mr. Y, from being asked, `Did Mr. X act as if he had read the record?'; and so ad infinitum. Thus the freedom of deliberation is indirectly restrained.
"* * * As a matter of policy and not of history, we think that efficient deliberation by a quasi-adversary, such as the Labor Board, is even more necessary than efficient deliberation by a neutral, such as a judge or a jury. Furthermore, since the litigants before the Labor Board are legion, the evil of harassment referred to by the Supreme Court in McDonald v. Pless [238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300] above cited, is correspondingly multiplied. The function of deciding controversies might soon be overwhelmed by the duty of answering questions about them."
The motion is denied.