377 So.2d 1188 (1979)
CENTRAL LOUISIANA ELECTRIC COMPANY, INC.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 64452.
Supreme Court of Louisiana.
November 1, 1979.
Rehearing Denied January 11, 1980.
*1189 Marshall B. Brinkley, Gen. Counsel, Baton Rouge, for La. Public Service Commission, defendant-appellee.
William O. Bonin, New Iberia, for Central La. Elec. Co., Inc., plaintiff-appellant.
Bobby L. Forrest, Forrest, Kiefer, Bacot & Moore, Baton Rouge, for intervenor-appellant, Forrest House Apartments.
SUMMERS, Chief Justice.
Forrest House Apartments (Forrest), a limited partnership, filed a complaint with the Public Service Commission (Commission) on September 10, 1976. The complaint set forth that Central Louisiana Electric Company, Inc. (CLECO) is a public utility, operating in Louisiana. On or about January 15, 1971, Forrest applied to the Department of Housing and Urban Development (HUD) for a loan to finance an apartment complex on Highway 28, also known as Holloway Prairie Road in Pineville, Louisiana. The application was approved on December 8, 1971, and amended November 9, 1972, whereby HUD issued a commitment to insure under the National Housing Act.
The complaint further set forth that, in order to obtain the commitment, Forrest made a market survey of the utility charges in the Alexandria-Pineville metropolitan area. Forrest based its request for mortgage insurance to the Federal Housing Commission on the data obtained, projecting an average utility cost of approximately $17.50 per month per unit. The estimate was based upon the rates prevailing in the area paid by customers being served by CLECO, the sole company furnishing electrical power in the area.
Between January 15, 1971 and December 8, 1971, at which time Forrest was approved for a loan by the Federal Housing Administration, representatives of CLECO met with *1190 Forrest, the complaint alleges. The purpose of these meetings was to discuss the most economically feasible method of furnishing electric power to the individual apartment units. At these meetings representatives of CLECO agreed, it is alleged, that if Forrest would meet what was then referred to as "Gold Medallion Standards", an "all electric" utility installation, CLECO would guarantee and contract to meter the apartment units in the most economical method in use in the area at that time to apartment owners.
According to the complaint, Forrest began construction on or about December 30, 1971, with CLECO furnishing electricity for the construction phase of the apartment project. The project consists of 80 living units and one office and laundry building combination. There are 20 one-bedroom units, 50 two-bedroom units, and ten three-bedroom units housed in 13 buildings, plus the office and laundry building.
Several buildings were substantially complete in the latter part of 1972. As each building passed final inspection it was energized by CLECO. After all of the apartment buildings had been energized, Forrest complained, it was noted in 1973 that the utility bills far exceeded those prevailing in the area. Complaints were made to CLECO, according to Forrest, and conferences were had in late 1973 and during 1974. In August 1974, Forrest alleges, it learned that CLECO had installed a metering device known as a "demand meter", to service its apartment complex, the installation having been made without the consent of Forrest. A "demand meter", according to Forrest, is a device and system for commercial establishments, and its use resulted in excessive charges for the electricity it used. With this knowledge Forrest again made formal demand on CLECO to reduce the rates, and CLECO replied that the "demand meter" and the rates it was charging were approved by the Commission.
Forrest asserts in its complaint that the "demand meter" is not in general use for apartments, and its use resulted in rates in excess of those paid by similar apartment complexes. For these reasons Forrest claims its rates were unreasonable and unjust. The Commission was asked to determine the extent and amount of the excessive charges.
CLECO answered, alleging that prior to October 8, 1971, its representatives met with a representative of Forrest. The meeting concerned Forrest's desire to have CLECO provide electric service through a master meter with free underground service from the meter to the apartments. No agreement was made nor did CLECO then guarantee to meter the apartments in any particular way. In addition, the answer asserts, the apartments did not meet CLECO's "Gold Medallion" standards.
In its answer CLECO admits that a "demand meter" is a device used for measuring load in order to compute the demand charge provided in the GS (General Service) rate schedule, and that representatives of Forrest indicated a desire to have electric service furnished through one meter in an effort to reduce electric energy charges. However, CLECO claimed it informed Forrest that in order to obtain this advantage it was necessary for Forrest to bear the cost of the distribution system beyond the meter. Forrest was unwilling to supply the required distribution system. Therefore, CLECO advised Forrest that demand meters were the alternative, they were approved by the Commission and electric energy was furnished under rates approved by the Commission.
Finally, CLECO answered, electric energy had been furnished to Forrest pursuant to the distribution plan approved by Forrest and pursuant to the applicable GS rate schedule.
In a supplemental complaint Forrest represents that subsequent to the meeting with representatives of CLECO in 1971, CLECO advised them in an October 8, 1971 letter that three types of service were available to Forrest:
"A. Primary meteringsingle or three phaseCLECO will build and provide *1191 service to (a) point on the property and install appropriate metering equipment. CLECO's ownership ceases at the meter and all work and equipment from that point on becomes the responsibility of the developer.
"B. Individual metering per apartment CLECO will install all overhead services to the apartment buildings at our cost, provided necessary rights-of-way are furnished.
"C. Individual metering per apartment (underground service using padmount transformers) CLECO will install, own and maintain all single phase primary lines and padmount transformers necessary to serve the apartment project. The Developer will pay in advance the difference in cost of an overhead system and the above mentioned (item C) underground service. The Developer will be responsible for installation of all secondary equipment and lines past the transformer."
Forrest having rejected these, by a November 3, 1971 letter CLECO suggested a fourth method:
"... to meter each building on a master meter. Again, this could be done through an overhead system where we installed all services to the buildings at our cost, or an underground system, where CLECO will install, own and maintain all single phase primary lines and pad mount transformers necessary to serve your apartments. With the underground, you would pay the difference between the cost of overhead and underground and be responsible for installation of all secondary equipment and lines past the transformers."
Forrest was not advised, it alleges, that selection of any one of the four types of service recommended by CLECO would result in rates higher than its competitors. To the contrary, Forrest asserts that CLECO represented Forrest would be given the most economical rate to induce Forrest to design its utility facilities for an "all electric" system.
Further, Forrest alleges it was ignorant of the differences in rate schedules applicable to different apartment complexes, charging that CLECO failed to disclose those differences.
After hearings held before a hearing examiner on September 15, 1977, and before the hearing examiner and a Commissioner on September 26, 1977, the Commission issued its order on February 15, 1978, finding that the apartments in the complex were not designed for individual metering since the installations required that some apartments share common water heaters. In essence the Commission rejected the idea that Forrest could utilize the Residential Service (RS) schedule. Nevertheless, because of the type loan the developers obtained and the fact that the monthly rent would include the cost of utilities, the Commission found that utility costs were of particular significance.
The order set forth that CLECO offered as the best available service the master metering of each building under the GS schedule which contained a demand charge for each meter based upon the highest 15-minute usage of electricity during each 24-hour period and declining block rates for kilowatt-hour (KWH) consumption.
Because of the high billings, Forrest contacted CLECO; and a combination of meters resulted from their negotiations but the rate reduction was negligible.
Several types of service were offered to apartment complexes by CLECO. Generally, comparable apartment complexes served by CLECO were individually metered. Although one other apartment complex had been placed under the GS rate schedule, that complex soon converted to individual meters.
Other types of service available would depend upon the KW demand of the customer. In this particular case, the Commission found, CLECO proposed the GS rate schedule with individual demand meters for each building, when the total demand of Forrest would indicate that the Large General *1192 Service (LGS) schedule with one demand master meter was the most economical and appropriate type of service.
Because of the demand charge for each meter under the GS schedule with the number of apartment units served through each meter, the charges to Forrest for each meter remained predominantly in the first or highest priced block of the tariff schedule because the KWH usage was insufficient to produce the economies of scale provided in this declining block schedule.
By way of illustration, the Commission noted: Actual billings under the GS schedule for the twelve-month period ending in September, 1976, were $35,714.98 with the combined KW demand ranging from a low of 300 KW to a high of 474 KW during the year. Average KWH billing for each of the 80 apartment units for the same period under the residential schedule would have produced $36,911.20. Therefore, the master metering provided relatively no economy to the customer. By comparison, combining the total KW demand and KWH consumption under one master meter and applying the LGS rate schedules would have resulted in total charges of $28,813.34, a saving of approximately $7,000 annually to Forrest.
Finding that Forrest attempted to contract for the most economical rate offered by CLECO and that CLECO failed to inform Forrest that the LGS schedule with a single master meter was the only rate which would provide the economy of scale with the KW demand required by Forrest, the Commission ordered CLECO to convert its service to the LGS rate schedule under a single master meter at CLECO's expense. In effect the Commission compelled CLECO to charge Forrest the LGS rate, and in doing so relieved Forrest of the obligation to install all the secondary equipment and lines beyond the transformers to the point of use.
CLECO applied for a rehearing which was refused. It then applied to the District Court for review.
In the District Court CLECO contended that the Commission's order was issued without review by the Commissioners and that the findings of fact were those of the hearing examiner. Thus, CLECO claimed, the order violated the Administrative Procedure Act (La.Rev.Stat. 49:957), requiring that when officials of an agency have not heard the case or read the record, the order shall not be made final until the parties are notified and given an opportunity to file exceptions and present briefs and oral arguments. This contention was rejected by the trial judge on the basis that because the Commission was acting in a quasi-judicial capacity, the manner in which its individual members have reached a determination is not open to examination or inquiry. In reaching this conclusion the court relied upon United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) and Weekes v. O'Connell, 304 N.Y. 259, 107 N.E.2d 290 (1952). In view of Louisiana's Administrative Procedure Act, we doubt the applicability of these authorities, but final resolution of this issue is unnecessary in view of the results reached in the instant case.
Because of the manner in which the Commission's determinations were reached, CLECO contended in the District Court that the Commission's findings should not be accorded the usual presumption of correctness. The court also rejected this contention.
It should be noted that this Court has not construed the Commission's authority as the trial judge did. While the Commission's findings are entitled to great weight and should not be reversed unless arbitrary, capricious and unreasonable, they must be based upon the law and the facts with a proper regard for the expertise of the Commission. Where that test is not met, courts should exercise their authority and decide the case on the law and the facts.
Thereafter, the trial judge reviewed the facts on the record. In doing so he found that energy costs were an important consideration in fixing prospective rents and that these considerations had a bearing upon HUD's approval of the financing of the *1193 Forrest project. The Forrest Project developers testified that in their negotiations with CLECO they requested that CLECO recommend the lowest-rated service available per unit. Upon CLECO's recommendation they selected a service which resulted in excessive rates. CLECO's representative, on the other hand, testified that Forrest was solely concerned with having CLECO absorb the installation costs of the service in order to reduce their capital investment. He testified that CLECO's October 8, 1971 letter supplied Forrest with three alternative proposals.
When Forrest rejected these three plans, CLECO, in its November 3, 1971 letter, suggested another alternative which embodied the GS schedule but provided for a demand meter at each apartment unit. This latter proposal was accepted by Forrest. After the proposal was adopted and the apartment buildings were energized, the complaints by Forrest followed.
Although the trial judge recognized that there was ample evidence to support CLECO's contention that the promoters of the apartment complex were essentially concerned with a system which would relieve them of any capital costs outlays for connections from the point of distribution to the ultimate user, the court also found adequate testimony that the developers were primarily interested in the lowest cost schedule. And to this end, the court decided, Forrest depended on CLECO's experience and knowledge to recommend such a system. Accordingly, the trial judge approved the Commission's order whereby it directed CLECO to place Forrest under the LGS rate schedule.
However, the trial court reversed and set aside the Commission order insofar as it required CLECO to pay the expense of installing services from the central distribution point to the individual apartment units. He decided the Commission's order on this phase of the case to be in direct contravention of the tariff approved by the Commission for the LGS schedule and the Commission's general order requiring compliance with published tariffs. The General Order of March 12, 1974, which he found applicable, provides:
"B) No public utility shall offer or provide services or any other thing of value to any subscriber, or potential subscriber, developer, architect, builder, investor, or other person which offering of service has not been previously approved by the Louisiana Public Service Commission."
For CLECO to offer to pay the expense of installing services from the central distribution point to the individual apartment units, the trial court held, would be a violation of the tariff in effect in 1971. Relying upon his court's decision in Central Louisiana Electric Company v. Louisiana Public Service Commission, 370 So.2d 497 (La. 1979), he decided the order in this respect was arbitrary and unreasonable and should be set aside.
Forrest appealed to this Court, as did CLECO. Although the Commission did not appeal, it submitted briefs on the applicability of the Administrative Procedure Act, the allegation of irregularities surrounding the Commission order, and the question of the weight to be accorded Commission findings by reviewing courts. Other than our previous statements on those issues in this opinion those questions are pretermitted. The decision reached today makes resolution of these issues unnecessary.
In its brief CLECO recognizes that its appeal is unusual because it is satisfied with the formal judgment of the trial court. In addition CLECO states that it has no objection to serving any customer under any applicable rate schedule as long as the customer satisfies the requirements of the tariff. Indeed, as CLECO asserts, the LGS rate schedule was offered to Forrest at the outset, but Forrest declined to accept it because it did not want to incur the cost of building and maintaining the facilities on the customer's side of the meter. Avoiding that expense, which other customers who subscribe to the LGS service must bear, is the reason Forrest pursues this appeal.
*1194 CLECO points out that the Commission decided that Forrest complained that the "demand meter" should be removed because it was installed without its knowledge. Forrest complained that other apartment complexes were on the schedule and that CLECO should be ordered to apply RS rates and refund the difference between the GS rates charged and the RS rates. The LGS rate schedule was never in contention, CLECO argues. Furthermore, CLECO argues, the RS rates were also denied to Forrest by the Commission.
On its appeal Forrest seeks to reinstate the Commission's order, assigning as error the application of the 1974 Order and the holding that the Commission's order of February 15, 1978, was in conflict with the 1974 General Order. It is their contention that the trial court could not apply the 1974 General Order ex post facto to a contract confected in 1971.
It is undisputed that the tariffs in effect in 1971, and the amendments thereto which occurred during the period from 1971 to the filing of the complaint in 1976, were adopted in accordance with a practice of the Commission whereby the proposed tariffs were filed with the Commission by the Company and approved by the Commission before being applied to customer service. The tariff schedules specified both the type of service to be offered and the rate at which electrical energy sales would be charged. The contract in effect between CLECO and Forrest was controlled by the tariff schedules as approved from time to time by the Commission which must be considered to have been incorporated into the terms of that contract. Otherwise it would have been a contract upon terms contrary to the state regulatory scheme for public utilities and as such a contract repugnant to public policy and reprobated by law. There is, therefore, no merit to Forrest's contention that in 1971 they succeeded in contracting with CLECO for anything other than the services offered and rates assessed in the filed and approved tariffs.
It is probable that the 1974 General Order merely incorporated and published prior Commission policy. Certainly there would be little point in a regulatory scheme under which utilities were not bound by the tariffs approved by the regulatory agency, and under which they could offer service combinations and rates in violation of the publicly-approved tariffs. The very nature of the public utility concept, providing necessary services to all members of the public upon terms equally available to all customers equally situated, belies such a practice. In any event, the 1974 General Order certainly applied to the Commission's own determination and Order issued in 1978: it could not offer Forrest advantages not available to others similarly situated, a practice reprobated by the Commission's General Order of 1974. If a public agency is not required to abide by its own rules and procedures, then the standard of review for "arbitrary and capricious" action is without meaning.
Although the question whether a regulatory agency is bound by its own rules has not been directly presented to this Court, it arose obliquely in the case of La. Consumer's League, Inc. v. La. Public Service Comm'n, 351 So.2d 128 (La.1977). In that case a consumers' group sought to intervene in proceedings before the Commission in accordance with a right granted by a rule of the Commission. Immediately prior to the institution of the proceedings in which the plaintiffs sought to intervene the Commission had amended the rule to change the status of interested parties to the detriment of the plaintiffs' rights on appeal. This Court held that while the rule-making provisions of the Administrative Procedure Act, La.Rev.Stat. 49:951-54, did not apply where the Commission was granted its rule-making authority by the Constitution, La. Const. art. 4, § 21, nonetheless that constitutional provision restricted the Commission's rule-making to a standard of reasonableness. Holding that the procedures used in the amendment of the rule in question had not been "reasonable" this Court set aside judgment of the District Court in favor of the Commission and directed the Commission to permit the intervention of the plaintiffs with the status accorded by the former version of the rule.
*1195 What is significant for the present case is that the decision of this Court rested upon the implicit assumption that the Commission was bound by its own rules:
"The ultimate issue to be decided in this case is the validity of the amendment to Rule 10 for, if this rule was improperly amended, the former version of Rule 10 remained in effect and granted to the League an unconditional right to intervene in the rate proceedings." 351 So.2d 128, 131.
It is not clear whether this assumption itself rested upon a belief that failure of the Commission to abide by its own rules would violate the constitutional standard of "reason" or upon some other inarticulate premise of law. It is clear, however, that the weight of opinion is to the effect that administrative agencies are bound by their own rules, at least by their own rules which are promulgated to affect the rights and liabilities of members of the public. Thus, "A legislative rule is clearly binding on the agency that issues it. The best single authority may now be United States v. Nixon, 418 U.S. 683, 694-96, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)." 2 K. Davis, Administrative Law Treatise § 7:21 (1979) (tracing the concept back to Mr. Justice Brandeis in Bilokumsky v. Tod, 263 U.S. 149, 155, 44 S.Ct. 54, 68 L.Ed. 221 (1923)). Professor Davis addressed the general problems of administrative law in this country; more specifically addressed to the federal scheme is 3 B. Mezines, J. Stein & J. Gruff, Administrative Law §§ 14.01-02 (1979). There it is suggested, in the language of Mr. Justice Roberts in Arizona Grocery Co. v. Atchison, T. & S. F. Ry., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932):
"As respects its future conduct the carrier is entitled to rely upon the declaration as to what will be a lawful, that is, a reasonable, rate .... Where, as in this case, the Commission has made an order having a dual aspect, it may not in a subsequent proceeding, acting in its quasi-judicial capacity, ignore its own pronouncement promulgated in its quasi-legislative capacity and retroactively repeal its own enactment as to the reasonableness of the rate it has prescribed." 284 U.S. at 389, 52 S.Ct. at 186.
We are of the opinion that this reasoning adequately expresses the restraints placed upon agency action by the rule of reason, a rule which is in the present case mandated by the very constitutional provision creating the agency. Furthermore, the "legislative rules" involved in the instant case are both the original tariff approvala rate-making rule determinationand the subsequent General Order. Thus we affirm the holding of the District Court that the Order of the Commission directing CLECO to change installations in a manner inconsistent with its filed and approved tariffs was unreasonable and must be set aside.
For the reasons assigned, the judgment of the trial court is affirmed.