**Paula JONES a/k/a Paula Corbin Jones, Plaintiff,**

v.

**Abraham J. HIRSCHFELD a/k/a Abe Hirschfeld, Defendant.**

**No. 01 Civ. 7585PKLGWG.**

United States District Court, S.D. New York.

Dec. 9, 2003.

Thomas F. Cohen, The Abramson Law Group, New York City, for Plaintiff.

Abraham J. Hirschfeld, Hirschfeld Realty, Inc., New York City, for Defendant.

David E. Kendall, Jonathan S. Jeffress, Williams & Connolly LLP, Washington, DC, for Non–Party William Jefferson Clinton.

## OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

Defendant Abraham J. Hirschfeld has issued a subpoena to non-party William Jefferson Clinton, the former President of the United States. Mr. Clinton has moved under Fed.R.Civ.P. 45(c)(3) for an order quashing the subpoena and under Fed.R.Civ.P. 26(c) for a protective order. For the reasons below, Mr. Clinton's motion is granted.

## I. BACKGROUND

### A. The Complaint

The complaint in this matter relates to a previous lawsuit that plaintiff Paula Jones brought against Mr. Clinton in May 1994 in the United States District Court for the Eastern District of Arkansas (the "Arkansas Lawsuit"). See, e.g., Jones v. Clinton, 858 F.Supp. 902 (E.D.Ark.1994). In the Arkansas Lawsuit, Ms. Jones alleged that Mr. Clinton had sexually harassed and assaulted her in 1991 when he was the Governor of Arkansas. See id. at 904.

Ms. Jones's complaint in the instant action alleges that while the Arkansas Lawsuit was still ongoing in October 1998,

[Mr. Hirschfeld] publicly announced that, in the interests of ending the [Arkansas] Lawsuit and what [Mr. Hirschfeld] claimed

was its deleterious effect on the United States, [Mr. Hirschfeld] promised and agreed to pay [Ms. Jones] the sum of one million ($1,000,000.00) dollars on the condition that she settle and discontinue the [Arkansas] Lawsuit.

Complaint, filed August 15, 2001 (Docket # 1) ("Compl."), ¶ 9.[1] On October 2, 1998, Mr. Hirschfeld caused a check to be issued for one million dollars payable to then-counsel for Ms. Jones. Thereafter, Mr. Hirschfeld displayed the check to the public and the news media but allegedly did not turn it over to Ms. Jones or her counsel. On October 31, 1998, Ms. Jones and Mr. Hirschfeld entered into a written agreement whereby Mr. Hirschfeld agreed to wire transfer one million dollars to Ms. Jones's counsel in exchange for Ms. Jones's discontinuance of the Arkansas Lawsuit (the "Hirschfeld Agreement"). See Agreement, dated October 31, 1998 (reproduced as Ex. 2 to Compl.), ¶¶ 1–2. Under the terms of this agreement, Mr. Hirschfeld was to transfer the money to Ms. Jones's counsel on November 2, 1998, on the understanding that it would not be withdrawn or distributed until the Arkansas Lawsuit was discontinued and dismissed with prejudice. Mr. Hirschfeld did not transfer the money, however.

Settlement negotiations in the Arkansas Lawsuit occurred during the fall of 1998. On November 13, 1998, Ms. Jones's attorney, William N. McMillan, sent Mr. Clinton's attorney, Robert S. Bennett, a letter constituting Ms. Jones's "final offer" to settle the Arkansas Lawsuit for $850,000 (the "McMillan Letter"). See Letter from McMillan to Bennett, dated November 13, 1998 (reproduced as Ex. C to Opposition to Motion to Quash Subpeona [sic] and for a Protective Order, filed November 7, 2003 (Docket # 56) ("Def.Mem.")), at 1. The letter also stated:

I [William N. McMillan] further represent to you [Robert S. Bennett] that the money from [Mr. Hirschfeld] is no longer on the table and that there will be no payment from Mr. Hirschfeld as part of the settlement with [Mr. Clinton].

Id. That same day, the attorneys for Ms. Jones and Mr. Clinton signed an agreement settling the Arkansas Lawsuit for $850,000. See Stipulation of Settlement and Release, dated November 13, 1998 ("Stipulation of Settlement") (reproduced in Ex. 5 to Declaration of Jonathan S. Jeffress, dated October 14, 2003 ("Jeffress Decl.")), ¶ 1. The settlement document, which makes no reference to the McMillan Letter or to the Hirschfeld Agreement, states that it constitutes the "entire and only agreement between the parties," that it is "not subject to any condition" and that "the consideration recited [therein] is the sole consideration for the parties' agreement to this Stipulation." Id. ¶¶ 6–7. Shortly thereafter, the Eighth Circuit dismissed Ms. Jones's appeal based on this settlement. See Jones v. Clinton, 161 F.3d 528 (8th Cir.1998).

In her complaint in this case, which was filed in August 2001, Ms. Jones alleges that because she settled the Arkansas Lawsuit, she is entitled to the payment promised in the Hirschfeld Agreement. Ms. Jones alleges that she never received this payment and thus seeks damages of one million dollars plus interest and costs. One of Mr. Hirschfeld's defenses is that, as a condition for settling the Arkansas Lawsuit, Mr. Clinton required Ms. Jones to reject the Hirschfeld Agreement. Mr. Hirschfeld alleges that Ms. Jones did in fact reject the agreement and that her rejection is evidenced by the representation contained in the McMillan Letter that the money from Mr. Hirschfeld was "no longer on the table" and that there would be "no payment" from Mr. Hirschfeld. See Answer and Counterclaim, filed November 14, 2001 (Docket # 5) ("Answer"), ¶ 23; Def. Mem. at 5–6. He thus contends that Ms. Jones abandoned the Hirschfeld Agreement and is therefore not entitled to the one million dollar payment.

B. *The Clinton Subpoena*

In September 2003, following the service in August of a defective subpoena, Mr. Hirsch-

1. The complaint alleges that the Arkansas Lawsuit at this time was in "discovery and other pretrial proceedings." Compl. ¶ 8. In fact, the case was then on appeal to the Eighth Circuit as

the trial court in April 1998 had granted Mr. Clinton summary judgment dismissing Ms. Jones's complaint. See Jones v. Clinton, 990 F.Supp. 657 (E.D.Ark.1998).

feld caused a subpoena duces tecum to be served on Mr. Clinton requiring his appearance at a deposition scheduled for October 6, 2003 (the "Clinton Subpoena"). *See* Subpoena in a Civil Case, dated September 22, 2003 (reproduced as Ex. 6 to Jeffress Decl.). The Clinton Subpoena included document requests for the McMillan Letter, for any stipulations relating to the agreement settling the Arkansas Lawsuit and for any other documents "pertaining to [Ms. Jones's] agreement to keep the $1,000,000 offered by [Mr. Hirschfeld] out of the settlement agreement." *See id.* Attach. 1. In response, Mr. Clinton's counsel sent Mr. Hirschfeld a copy of the McMillan Letter. *See* Letter from Kendall to Hirschfeld, dated October 1, 2003 (reproduced as Ex. 7 to Jeffress Decl.), at 1. Shortly thereafter, Mr. Clinton filed the instant motion to quash the Clinton Subpoena and for a protective order. *See* Notice of Motion of Non–Party William Jefferson Clinton to Quash Subpoena and for a Protective Order, filed October 28, 2003 (Docket # 53). As no record has been made regarding any documents called for by the Clinton Subpoena that have not already been produced, the Court construes Mr. Clinton's motion as seeking to prevent only his deposition.

## II. *LAW GOVERNING FED. R. CIV. P. 26 AND 45*

In general, a party may obtain discovery of any non-privileged matter that is relevant to a claim or defense of any party. Fed. R.Civ.P. 26(b)(1). Nonetheless, a court has discretion to circumscribe discovery even of relevant evidence by making "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R.Civ.P. 26(c); *see Herbert v. Lando,* 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

Fed.R.Civ.P. 45(c) provides additional protection for non-parties subject to a subpoena by mandating that a court "quash or modify the subpoena if it ... subjects [the] person to undue burden." Fed.R.Civ.P. 45(c)(3)(A)(iv). The Advisory Committee's Notes to the 1991 amendments to Fed. R.Civ.P. 45 state that the amendments have "enlarge[d] the protections afforded persons who are required to assist the court by giving information or evidence." Fed.R.Civ.P. 45 1991 advisory committee's note; *see id.* (Fed.R.Civ.P. 45(c)(3)(A)(iv) "requires the court to protect all persons from undue burden imposed by the use of the subpoena power").

 Determinations of issues of "undue burden" are committed to the discretion of the trial court. *See, e.g., In re Subpoena Issued to Dennis Friedman,* 350 F.3d 65, 68–70 (2d Cir.2003); *Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 49 (S.D.N.Y.1996); *see also* Fed.R.Civ.P. 26 1970 advisory committee's note ("Rule 26(c) .., confers broad powers on the courts to regulate or prevent discovery even though the materials sought are within the scope of [discovery under Fed.R.Civ.P.] 26(b), and these powers have always been freely exercised."); *Herbert,* 441 U.S. at 177, 99 S.Ct. 1635 ("[T]he district courts should not neglect their power to restrict discovery" under Fed.R.Civ.P. 26(c) and "should not hesitate to exercise appropriate control over the discovery process."). In making this determination, a court must limit a party's discovery if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2). Thus, it is settled that "judges may prevent [a] proposed deposition when the facts and circumstances are such that it creates an inappropriate burden or hardship." *In re Subpoena Issued to Dennis Friedman,* 350 F.3d at 70. The burden of persuasion in a motion to quash a subpoena and for a protective order is borne by the

movant. *See, e.g., Dove v. Atl. Capital Corp.,* 963 F.2d 15, 19 (2d Cir.1992) (citing *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.,* 663 F.2d 371, 391 (2d Cir.1981)); *Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH,* 1998 WL 338106, at \*1 (S.D.N.Y. June 25, 1998); *Concord Boat Corp.,* 169 F.R.D. at 48–49.

## III. *DISCUSSION*

### A. *The Heightened Standard for Deposing High–Ranking Government Officials*

■■■ While even a sitting United States President may be compelled to comply with a subpoena under some circumstances, *see, e.g., United States v. Nixon,* 418 U.S. 683, 707, 713, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), courts have recognized that requests to depose a high-ranking government official are subject to a heightened standard of review. As one court put it: "While granting a protective order and quashing a deposition is the exception rather than the rule, the burden a deposition would place on a high ranking government official must be given special scrutiny." *Marisol A. v. Giuliani,* 1998 WL 132810, at \*2 (S.D.N.Y. Mar. 23, 1998). Under that heightened standard, "high ranking government officials are not subject to depositions" absent a showing by the party seeking the deposition that "(1) the deposition is necessary in order to obtain relevant information that cannot be obtained from any other source and (2) the deposition would not significantly interfere with the ability of the official to perform his governmental duties." *Id.* at \*2–3 (citations omitted); *accord In re United States,* 985 F.2d 510, 511–13 (11th Cir.), *cert. denied,* 510 U.S. 989, 114 S.Ct. 545, 126 L.Ed.2d 447 (1993); *Williams v. McCausland,* 1994 WL 62937, at \*3 (S.D.N.Y. Feb. 22, 1994); *Martin v. Valley Nat'l Bank,* 140 F.R.D. 291, 314 (S.D.N.Y. 1991); 6 James Wm. Moore et al., *Moore's Federal Practice* ¶ 26.105[2][a] (3d ed.2003).

■■■ Mr. Clinton argues that this heightened standard should be applied to his deposition based on his status as a former President of the United States. *See* Memorandum of Law in Support of Motion of Non–Party William Jefferson Clinton to Quash Subpoena and for a Protective Order, filed October 28, 2003 (Docket # 54) ("Clinton Mem."), at 13–16. While he recognizes that he does not at this time hold government office, he argues that he has unspecified "varied duties" as a former President, that he maintains "an active schedule both at home and abroad" and that the deposition would "needlessly distract him." *Id.* at 14–15.

Certainly, a former President is accorded privileges by law not granted to the ordinary citizen. *See, e.g.,* 18 U.S.C. § 3056(a)(3) (lifetime entitlement to Secret Service protection); Act of Jan. 8, 1971, Pub.L. No. 91–658, § 6, 84 Stat. 1961, 1963 (current version at 3 U.S.C. § 102 note) (lifetime annuity "equal to the annual rate of basic pay ... of the head of an executive department"); 39 U.S.C. § 3214 (free postage for any non-political mail); Act of Aug. 25, 1958, Pub.L. No. 85–745, § 1(b)–(c), 72 Stat. 838, 838 (current version at 3 U.S.C. § 102 note) (entitlement to office staff and furnished office space); 16 U.S.C. § 467b(a) (entitlement to have commemorated sites or structures either associated with "deeds, leadership, or lifework" in office or otherwise "suitable as a memorial"). Putting aside the question of whether an official no longer in office should ever be subject to the heightened standard, a more fundamental problem with Mr. Clinton's argument is that Mr. Hirschfeld seeks to depose him only "about decisions he made as a private individual" and not about his former official activities. Def. Mem. at 9. The complaint itself also reflects that the issues in this case bear no relation to Mr. Clinton's former duties as President.

The case law setting forth the heightened standard to be satisfied in order to depose high-ranking government officials evolved from instances where litigants sought the testimony of the heads of administrative agencies to challenge agency decisions. *See, e.g., United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *Peoples v. United States Dep't of Agric.,* 427 F.2d 561, 567 (D.C.Cir.1970). Courts have been understandably disinclined to "probe the mental processes" of such officials, *Morgan,* 313 U.S. at 422, 61 S.Ct. 999, when some

other source of information—such as other agency personnel or a record already made before the agency—is available. This concern, however, does not apply in instances where the testimony sought is unrelated to the official's public duties. It represents no intrusion on an official's function to require the official to testify on a matter unrelated to that function. As Jeremy Bentham noted: " 'Were the Prince of Wales, the Archbishop of Canterbury, and the Lord High Chancellor, to be passing by in the same coach, while a chimney-sweeper and a barrow-woman were in dispute about a halfpennyworth of apples, and the chimney-sweeper or the barrow-woman were to think proper to call upon them for their evidence, could they refuse it? No, most certainly.' " *Branzburg v. Hayes*, 408 U.S. 665, 688 n. 26, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (quoting 4 *The Works of Jeremy Bentham* 320–21 (J. Bowring ed. 1843)); *cf. Clinton v. Jones*, 520 U.S. 681, 686, 695, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (rejecting Mr. Clinton's "effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office" where it was "perfectly clear that the alleged misconduct of" Mr. Clinton in the Arkansas lawsuit "was unrelated to any of his official duties").

While the burden on a high-level government official in submitting to a deposition may be the same whether the deposition relates to official as opposed to unofficial duties, there is no reason to believe that this burden may not be adequately addressed as part of traditional "undue burden" analysis under Fed.R.Civ.P. 26 and 45 rather than as an application of the heightened standard governing high-raking officials. Accordingly, the Court declines Mr. Clinton's invitation to apply this standard in an instance where the testimony sought has no relationship to his former official duties.

B. *Appropriateness of Deposing Mr. Clinton*

Fed.R.Civ.P. 26(c) and 45(c) provide protection to all non-party witnesses in responding to subpoenas that subject them to an "undue burden." In addition, Fed.R.Civ.P. 26(b) permits discovery only as to matters that are relevant. Thus, this Court will consider, as it would for any other non-party witness, Mr. Clinton's arguments that the discovery sought is not relevant and that it would be unduly burdensome for him to respond.

As previously discussed, discovery is permissible "regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). In his Answer, Mr. Hirschfeld states as an affirmative defense that "[Ms. Jones] agreed not to accept any monies from [Mr. Hirschfeld] subsequent to the [Hirschfeld] Agreement as a condition of settlement of the [Arkansas Lawsuit], and, therefore, abandoned the [Hirschfeld] Agreement." Answer ¶ 23. In his motion papers, Mr. Hirschfeld contends that Mr. Clinton "would not settle with [Ms. Jones] unless she agreed not to take [Mr. Hirschfeld's] money." Def. Mem. ¶ 2, at 1. Mr. Hirschfeld points to a news report stating that Mr. Clinton had rejected Ms. Jones's earlier attempts at settling the Arkansas Lawsuit in part because of the existence of the Hirschfeld Agreement. *See Clinton Rejects $2 Million Jones Settlement Offer,* CNN.com, Oct. 19, 1998 (reproduced as Ex. B to Def. Mem.). This news report is consistent with the McMillan Letter, which contains Ms. Jones's attorney's explicit representation that any payments from Mr. Hirschfeld were "no longer on the table." McMillan Letter at 1. As a matter of logic, there would have been no reason for Ms. Jones's attorney to make such a representation in the absence of a requirement from Mr. Clinton that he do so.

Mr. Clinton argues that he can offer no non-privileged testimony relevant to Mr. Hirschfeld's defense. *See* Clinton Mem. at 9–10. He has submitted a sworn statement that, other than privileged discussions with counsel, his "only knowledge of an offer by [Mr. Hirschfeld] to pay [Ms. Jones] $1 million in exchange for dismissing the [Arkansas Lawsuit]" derives from "what [he] learned through the public news media." Declaration of William Jefferson Clinton, dated October 8, 2003, ¶ 4. Mr. Hirschfeld counters that "[s]ince [Mr. Clinton] agreed to [Ms. Jones's] final offer, he possesses unique knowledge of

his understanding of whether [Ms. Jones] offered to repudiate the [Hirschfeld Agreement]." Def. Mem. ¶ 3, at 2. Mr. Hirschfeld also asserts that "only" Mr. Clinton "has personal knowledge of whether he insisted that [Ms. Jones] agree to not accepting [Mr. Hirschfeld's] money before he would settle with her." *Id.* at 6.

While a sworn statement of the kind Mr. Clinton has submitted denying personal knowledge of the relevant facts may in some limited circumstances itself form a basis for issuing a protective order, *see, e.g., Thomas v. IBM*, 48 F.3d 478, 482–83 (10th Cir.1995); *Lewelling v. Farmers Ins. of Columbus, Inc.*, 879 F.2d 212, 218 (6th Cir.1989), Mr. Hirschfeld's effort to obtain testimony from Mr. Clinton suffers from a more fundamental defect. Specifically, whether Mr. Clinton "insisted" that Ms. Jones decline Mr. Hirschfeld's offer or had an "understanding" that she had so done is not relevant to any issue in this case. Rather, what is relevant is whether Ms. Jones in fact repudiated or refused to accept Mr. Hirschfeld's offer. Mr. Hirschfeld has not even postulated that there exists a scenario under which Mr. Clinton has acquired any non-privileged personal knowledge regarding these facts.

Even putting aside the denial contained in Mr. Clinton's sworn statement, the circumstances under which the refusal or repudiation allegedly occurred point to the inexorable conclusion that Mr. Clinton has no relevant information to offer. Mr. Hirschfeld does not allege that Ms. Jones at any time personally communicated with Mr. Clinton regarding the Arkansas Lawsuit or the Hirschfeld Agreement. Instead, Mr. Hirschfeld points only to negotiations regarding the settlement agreement between their representatives, including Mr. McMillan, Ms. Jones's lawyer, and Mr. Bennett, Mr. Clinton's lawyer. *See* Def. Mem. at 5–6; *see also* McMillan Letter at 1–2; Stipulation of Settlement at 3–4. Thus, to the extent that Mr. Hirschfeld seeks to determine whether there were conditions for set-

tlement that do not appear in the settlement agreement itself—in particular, Ms. Jones's commitment not to accept the money from Mr. Hirschfeld—the representatives who negotiated the agreement will provide the only competent evidence on this score. To the extent Mr. Hirschfeld seeks to determine if Ms. Jones herself rejected the Hirschfeld Agreement in some other manner, there is no reason to believe Mr. Clinton has any information on this topic.

Thus, it does not matter whether or not Mr. Clinton "insisted" or had an "understanding" that Ms. Jones's rejection of the Hirschfeld Agreement was a necessary condition to settling the Arkansas Lawsuit. What matters is whether Ms. Jones committed to such a condition in some form—an event that would have been revealed not to Mr. Clinton personally but rather to his representatives during the course of settlement discussions with Ms. Jones's representatives. Were their representatives not attorneys, Mr. Hirschfeld understandably might wish to test the accuracy of any statements given by these representatives by inquiring of the principals themselves as to what they learned from their representatives regarding the settlement discussions. In this case, however, these representatives are attorneys and Mr. Hirschfeld has not provided any plausible argument that the conversations between Mr. Bennett and Mr. Clinton regarding the settlement discussions would not be covered by the attorney-client privilege.[2]

A stated lack of knowledge by a witness as to an area proposed for deposition—heavily supported as it is here by external facts—might by itself be enough to support issuance of a protective order on the ground of "undue burden." But a more fundamental concern exists in this case inasmuch as discovery has ended with Mr. Hirschfeld having chosen not to depose Mr. Bennett, Mr. McMillan or any other representative who participated in the settlement discussions. Obviously, these individuals have first-hand knowledge as to

2. Mr. Hirschfeld's suggestion that the McMillan Letter is an attorney-client privileged document and that Mr. Clinton's disclosure of that document in response to the Clinton Subpoena operated as a waiver of Mr. Clinton's attorney-client privilege, Def. Mem. at 7, is frivolous. The letter was not a communication between Mr. Clinton and his attorney and thus it is not privileged. Accordingly, its production could not waive Mr. Clinton's attorney-client privilege.

78

what statements were made during the course of these discussions. The decision not to depose Mr. McMillan is especially strange, as he is the very individual who "represent[ed]" that "the money from [Mr. Hirschfeld was] no longer on the table and that there [would] be no payment from Mr. Hirschfeld as part of the settlement with [Mr. Clinton]." McMillan Letter at 1. Mr. McMillan obviously has the greatest and most direct knowledge of how this condition came about and the means by which it was expressed. Mr. Hirschfeld's choice to subpoena Mr. Clinton under these circumstances—and not any of Mr. Clinton's or Ms. Jones's representatives—suggests that the subpoena is less an effort to seek relevant information than one designed merely for the sake of conducting Mr. Clinton's deposition.

Thus, in light of the existence of other individuals with primary knowledge of the matters at issue, Mr. Hirschfeld's failure even to attempt to seek their testimony, and the absence of any basis for believing Mr. Clinton has non-privileged information regarding any relevant matter, Mr. Clinton has demonstrated that it would constitute an "undue burden" for him to be compelled to testify. Accordingly, the Court grants Mr. Clinton's motion for a protective order and quashes the Clinton Subpoena insofar as it seeks his testimony by deposition.

*Conclusion*

The motion to quash the subpoena and for a protective order (Docket # 53) is granted.