ZAGER, Justice
(dissenting).
I concur in the well-reasoned majority opinion where it recognizes that the administrative law judges (ALJs) in the Iowa Department of Corrections (IDOC) are entitled to assert the mental-process privilege in response to the Ombudsman’s request for an investigatory deposition. I also agree that this privilege is not absolute and may be overcome by a strong showing of “bad faith” or “improper behavior.” But I respectfully dissent from the majority’s opinion when it decides, on this record, that the Ombudsman has made a strong showing of bad faith or other improper behavior on the part of Edwards *25 sufficient to overcome the mental-process privilege.
As the majority accurately states, Edwards is entitled to the “presumption of regularity that attaches to the decisions of administrative agencies that protects them against inquiry into how they reach their decisions based on mere suspicion.” See Martin Marietta Materials, Inc. v. Dallas County, 675 N.W.2d 544, 554 (Iowa 2004) (citation and internal quotations omitted). However, while the majority has concluded that undisputed facts in the record establish a “strong showing of bad faith or improper behavior” sufficient to overcome the mental-process privilege, I disagree. Most significantly, the district court did not reach this issue. It made no findings of fact or conclusions of law on this issue, which is not surprising considering the parties did not develop the record on this issue, concentrating instead on whether the privilege applied to ALJs or not. Generally, “[w]e do not review issues that have not been raised or decided by the district court.” State v. Dewitt, 811 N.W.2d 460, 467 (Iowa 2012).
Whether the privilege applied was decided by the district court, although incorrectly. Without an adequate record and a decision by the district court, we should decline to reach the issue of whether the Ombudsman has demonstrated sufficient objective facts to convince a reasonable fact finder that Edwards acted in bad faith or otherwise acted improperly. Clearly the Ombudsman has not exhausted its investigative opportunities.
“It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.” Meier v. Senecaut, 641 N.W.2d 532, 537 (Iowa 2002). “[I]t is not a sensible exercise of appellate review to analyze facts of an issue ‘without the benefit of a full record or lower court determination[ ].’ ” Id. (quoting Yee v. City of Escondido, 503 U.S. 519, 538, 112 S.Ct. 1522, 1534, 118 L.Ed.2d 153, 172 (1992)). As such, it is impossible to conclude from this record that Edwards acted improperly or in bad faith. See Martin Marietta, 675 N.W.2d at 557 (remanding to allow expanded discovery, rather than simply allowing the mental-process privilege to be voided, as the plaintiff had not made a sufficient showing of bad faith or improper behavior). I would decline to decide this issue on the existing record.
I. Standard to Overcome Mental-Process Privilege.
Preliminarily, I think it is important to define the standard the Ombudsman must meet in order to determine whether the Ombudsman has met that standard.
A. Defining Bad Faith or Improper Behavior. The majority accurately defines “improper behavior,” and I concur with that definition. In order to demonstrate bad faith or improper behavior sufficient to overcome the mental-process privilege, the Ombudsman must demonstrate that Edwards’s actions consisted of behavior that was “[i]ncorrect[,] unsuitable or irregular” or “[fraudulent or otherwise wrongful.” See Black’s Law Dictionary 826 (9th ed.2009) (defining “improper”). Further, the Ombudsman must “point to objective facts sufficient to convince a reasonable fact finder that bias exists.” See Kholeif v. Bd. of Med. Exam’rs, 497 N.W.2d 804, 807 (Iowa 1993).
B. Bad Faith or Improper Behavior by the Decision Maker. The majority focuses its analysis on “improper behavior by the warden and [administrative law judge] Edwards.” I believe this focus is not only too broad, but also improperly expands the analysis of bad faith or improper behavior to the actions of third *26 parties contrary to existing federal precedents and our own precedents. The standard articulated in Citizens to Preserve Overton Parle v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the leading United States Supreme Court case, adopted by this court in Martin Marietta and Kholeif, focuses on whether the decision maker acted improperly. Citizens to Preserve Overton Park analyzed the decision of the Secretary of Transportation and dealt with issues specific to a situation in which the Secretary made no formal factual findings. 401 U.S. at 408, 91 S.Ct. at 819, 28 L.Ed.2d at 149. The Supreme Court remanded the case to the district court to review the entire administrative record. Id. at 420, 91 S.Ct. at 825, 28 L.Ed.2d at 155. Only if a full review failed to yield satisfactory answers did the Court say that the district court should proceed to an analysis of whether there was a “strong showing of bad faith or improper behavior” sufficient to pierce the mental-process privilege. Id. No other individual or entity was alleged to have acted improperly. Id.
Martin Marietta is specific as to the fact that it is the decision maker who must show bad faith in order for the mental-process privilege to be defeated. 675 N.W.2d at 554 (“The problem here was that Martin Marietta did not make a proper showing of bad faith or improper behavior on the part of Board of Adjustment members[7] to overcome the presumption of regularity.” (Emphasis added.)). In citing the “strong showing of bad faith or improper behavior” standard, Martin Marietta relied on a group of federal cases in addition to Iowa cases. Id. One of these cases was equally specific that it is the decision maker that must show bad faith in order for the mental-process privilege to be pierced. See Nat’l Audubon Soc’y v. Hoffman, 132 F.3d 7, 14 (2d Cir.1997) (“[A]n extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decision makers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency’s choice.” (emphasis added)) (citing Citizens to Preserve Overton Park, 401 U.S. at 420, 91 S.Ct. at 825, 28 L.Ed.2d at 155).
Here, we do not have a full record on which to rely. However, the Ombudsman does have plenary powers of investigation, including the power to “[i]ssue a subpoena to compel any person to appear, give sworn testimony, or produce documentary or other evidence relevant to a matter under inquiry.” Iowa Code § 2C.9(5) (2009). This fact makes it distinct from Citizens to Preserve Overton Park and Martin Marietta, as the plaintiffs in those cases had limited ability to gain information regarding the decisions being questioned. See Citizens to Preserve Overton Park, 401 U.S. at 420, 91 S.Ct 814, 28 L.Ed.2d at 155; Martin Marietta, 675 N.W.2d at 554. Even in these cases, the courts required further discovery by the party attempting to pierce the mental-process privilege before considering whether piercing the privilege would be appropriate. Id. Just as significantly, the Ombudsman cannot rely on a showing that the warden acted improperly to pierce the mental-process privilege. Only the actions of Edwards are at issue here. The majority appears to expand on our prior analysis of these cases, and overrule our precedents in the process, in reaching its conclusion.
*27 II. Prison Disciplinary System.
It must be noted that the prison disciplinary system is not identical to the criminal justice system. We have previously quoted the United States Supreme Court in acknowledging that prisoners have only limited due process rights. Bruns v. State, 503 N.W.2d 607, 611 (Iowa 1993)
The reason for this limited due process right is that “[pjrison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.”
Id. (quoting Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951 (1974) (citation omitted)). However, this is not to imply that the prison disciplinary system should be less than fair and impartial, or that it should not be subject to appropriate scrutiny.
Ex parte communication with a decision maker in the criminal justice system is strictly controlled. In contrast, Michael Savala, the department of corrections in-house counsel who oversees the ALJs, testified he strongly encourages ALJs to interact with prison staff regarding their decisions, noting this communication makes it possible for ALJs to do their jobs better. While he stated he would not encourage communication before the ALJ conducts a hearing, he clarified, “[I]f that communication were to occur, ... I just tell the ALJs to ... [not] shut down any comments you may get.” Rather, according to Savala, it becomes the ALJ’s responsibility to maintain independence regardless of ex parte communications. Nothing in the record indicates that Edwards was asked why she did not recuse herself. This type of procedural question would assist a district court in determining whether she exhibited bad faith or improper behavior and would follow our precedent of requiring a plaintiff to explore other avenues for obtaining information before conducting a “fishing expedition[ ]” into the mental processes of decision makers. See Kholeif, 497 N.W.2d at 807.
III. Importance of Mental-Processes Privilege.
Many other avenues of exploration to establish bad faith or improper behavior exist — including deposing witnesses and subpoenaing all communications between Edwards and other entities. “ ‘[I]nquiry into the mental processes of administrative decisionmakers is usually to be avoided.’ ” Kholeif, 497 N.W.2d at 806 (quoting Citizens to Preserve Overton Park, 401 U.S. at 420, 91 S.Ct. at 825, 28 L.Ed.2d at 155) In Citizens of Overton Park, the U.S. Supreme Court held that because there was an absence of “formal findings ... it may be that the only way there can be effective judicial review is by examining the deci-sionmakers themselves.” 401 U.S. at 420, 91 S.Ct. at 825-26, 28 L.Ed.2d at 156 (1971).
Even though his actions are central to these events and are being closely scrutinized, the record is devoid of any statements or testimony from the warden, though argument from the Ombudsman does indicate he was interviewed. Requiring the Ombudsman to supplement the record allows us to protect the mental-process privilege unless and until a strong showing of bad faith or improper behavior is made.
Until the Ombudsman has exhausted its investigative opportunities, I am unwilling to invade the sacrosanct mental processes of the decision maker. See Kholeif, 497 N.W.2d at 807 (“Because the agency had not formally received or considered evi *28 dence of bias, nor resolved the issue as part of the contested case record, the district court was without authority to expand the record to include the deliberations or permit the board to depose commission members on their views.”)
The U.S. Supreme Court has held that it is “not the function of the court to probe the mental processes of the [administrative decision maker].” United States v. Morgan, 813 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429, 1435 (1941) (emphasis added) (citation and internal quotation marks omitted). “Just as judges cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected.” Id. (citation omitted).
IV. Finding Bad Faith or Improper Behavior on This Record.
It is important to recognize just how minimal the record is in this case. The majority bases its decision on four facts, one of which is irrelevant, two of which are at least partially disputed, and one of which requires more context in order to be probative. These four facts are:
(1) Edwards’s initial sanction doubled the allowable sanction for loss of earned time for a class “B” assault and matched the warden’s suggested penalty; (2) the assault did not involve a weapon or bodily fluids to justify the penalty imposed; (3) no other aggravating factors were listed; and (4) Edwards changed the assault to a class “A” after the Ombudsman’s investigation commenced, without listing any enumerated factors or using the term “aggravated” as seen in other decisions.
The first fact, “Edwards’s initial sanction doubled the allowable sanction for loss of earned time for a class “B” assault and matched the warden’s suggested penalty” is certainly the most facially damning, but lacks context. The email in which the warden purportedly makes this “suggestion” does not appear in the record, nor is there evidence regarding the full text or context of the email. Rather, only a part of the email is included in the Ombudsman’s statement of undisputed facts, which was subsequently admitted by IDOC and Edwards. The admitted portion is the single sentence, “Please exercise sanctions to fit situation (180 to 365).”
This fact does not necessarily indicate bad faith or improper behavior on the part of Edwards without any information regarding typical practices and procedures, particularly in light of the unique parameters of the prison disciplinary system. Sa-vala, in fact, testified that the penalty structure on a class “B” violation was not symmetrical with the penalty structure on class “A” and class “C” violations. If the penalty for a class “B” violation had been symmetrical with the penalties for the class “A” and class “C” violations, the penalty Edwards imposed would have fit within those parameters, making it more likely that this was an error and not bad faith or improper behavior.
We also face the difficulty of attempting to discern whether Edwards violated policy without having the benefit of knowing the specific practices at the prison related to the disciplinary policies. Savala indicated that IDOC’s generalized policies are sent to the different prisons, then developed into specific local procedure, so we do not know if the policies were massaged to fit local conditions. In fact, Savala specifically stated numerous times that he was unfamiliar with standard operating procedure at the Fort Dodge Correctional Facility. Based on this record, we do not know if it is routine or problematic for an ALJ to assign a discipline outside of the policy. We only know that it happened in this one situation. While Iowa Code section 903A.4 does not facially allow deviation from poli *29 cy and procedural rules established by the director of the IDOC, neither does it specifically prohibit institution-specific deviations.[8] We also know that when Savala was asked if the policies were mandatory, he replied, “[T]hat gets into kind of a gray area.... [E]ach institution will develop a more specific local procedure.”
Certainly, ex parte communication from an appellate tribunal is suggestive of improper influence in the criminal justice context. However, the only evidence in the record that indicates what the general practices ALJs follow is the testimony of Savala, who testified he encourages communication between the prison staff and ALJs, even if it occurs prior to the hearing. As a result, it is premature to conclude impropriety in this context.
It is also possible that it is the warden’s actions that are deserving of criticism and that Edwards acted entirely appropriately.[9] In fact, the majority seems to conclude that the warden did act inappropriately. It is within the power of the Ombudsman to subpoena and question the warden on these communications. Similarly, it is within the power of the Ombudsman to question Edwards about this and other communications without invading her mental-process privilege. In fact, both IDOC and Edwards stipulated that she would answer “questions with regard to the background and some of the procedural issues regarding the discipline.” One of the functions of the Ombudsman is to oversee this agency. It would appear to be a reasonable part of that job to expand its search beyond this one disciplinary action to determine if serious systemic problems exist at the Fort- Dodge Correctional Facility and make recommendations based on a better understanding of the entire process. See Citzens’ Aide/Ombudsman v. Miller, 543 N.W.2d 899, 902 (Iowa 1996) (noting that the purpose of the Ombudsman is to “investigate complaints received ‘from any source concerning an administrative action’ of a state agency” (quoting Iowa Code § 2C.12)). On this record, it is impossible to determine whether serious systemic problems existed, and if they did, further determine the genesis of those problems. Making a predetermination on an incomplete record that Edwards acted in bad faith or improperly would not aid the Ombudsman in fulfilling its statutorily-prescribed duties.
The second fact on which the majority relies is not probative. The majority correctly notes that “the assault did not involve a weapon or bodily fluids to justify the penalty imposed.” This fact relates to the definition of a class “A” assault, for which the penalty would be within that prescribed by IDOC policy. See IDOC Policy IO-RD-01(IV)(P)(4)(2)(e); id. 10-RD-01(IV)(P)(2)(a)(l). However, neither the Ombudsman nor IDOC and Edwards argue that this assault should have been facially classified as a class “A” assault. Rather, the question is whether the sanction in this case could be upgraded to the next class of offense based upon aggrava *30 ting circumstances. Under department of corrections policy, “[i]f the Administrative Law Judge determines that the factors or circumstances of an offense are more serious than the charged offense, the sanction may be upgraded to the next class.” Id. IO-RD-Ol(IIIXB). Clearly, Edwards had the authority to do this. As such, the fact that this offense is not a class “A” offense, on its face, is irrelevant to a determination as to whether Edwards acted improperly or in bad faith.
The third fact on which the majority relies is not supported by the record. “[N]o other aggravating factors were listed.” This fact is sharply disputed. IDOC policy provides:
The Administrative Law Judge shall specify in writing the aggravating circumstances warranting a change in sanction. Aggravating factors may include, but are not limited to: history of violence, use of weapon, severity of injury, significant impact to institutional operations, repeat infractions, and premeditation.”
Id. IO-RD-01(III)(B).
Based on Edwards’s report and the evidence in the record, including a videotape of the incident, Savala concluded that Edwards did make a finding of aggravating circumstances, and further, that such a finding was warranted. Specifically, he noted that Linderman assaulted the officer multiple times, which qualifies as a “repeat infraction,” an aggravating factor. Additionally, he went into some detail as to how this assaultive conduct would cause “significant impact to institutional operations,” another aggravating factor. Savala also noted that the policy did not require Edwards to use the term “aggravating,” just that she note the inmate’s actions.
Edwards’s April 24 decision expressly found Linderman’s behavior in a common area “placed a staff member’s safety at risk” and disrupted prison operations. This language indicates that his conduct caused “significant impact to institutional operations.” She noted his disobedience continued until other staff arrived, and Edwards recommended Linderman be evaluated for transfer to “a more secure environment,” a recommendation which is suggestive of his threat to institutional operations. Her initial report concluded the sanction “reflects the severity of the offense and is appropriate to the nature of the offense.” Her June 12 statement added, “[T]he class offense ... is being modified to reflect the seriousness of the violation at this time.”
The fourth fact on which the majority relies is partially disputed and not sufficiently probative. “[Edwards] changed the assault to class “A” after the Ombudsman’s investigation commenced, without listing any enumerated factors or using the term ‘aggravated’ as seen in other decisions.” As noted earlier in my discussion, whether Edwards listed enumerated factors is a sharply disputed fact. The fact that she changed her report after the Ombudsman’s investigation began is not necessarily indicative of bad faith or improper behavior. It is equally likely that she simply corrected a mistake that had been brought to her attention.
The “other decisions” language refers to four sample cases where the terms “aggravated” or “aggravation” were used. Without context, this is not instructive in our analysis. The Ombudsman presented too little information for us to determine how common the use of these terms are in disciplinary decisions. Critical questions are unanswered, such as: How many disciplinary cases are decided each year? Do all or most of the ALJs specifically use the term “aggravated” or “aggravation”? Is it proper or customary to use words like “seriousness” as a basis for enhancing a *31 violation? Do the authors of the sample reports use a derivative of the term “aggravated” consistently? The majority presents no statutory authority nor IDOC policy to indicate use of the term is required and no evidence to suggest it is even customary.
Thus, the Ombudsman asks us to make a decision based on the bare facts that an email was sent from the warden to Edwards and that she gave a penalty appropriate for a class “A” violation without explicitly stating she was aggravating the violation from a class “B” to a class “A.” I am not disputing that such activity looks suspicious. However, I am not prepared to conclude, as a matter of law, that this evidence, without more, constitutes a strong showing of bad faith or inappropriate behavior on the part of Edwards, particularly in the context of a prison disciplinary case. The majority seems equally reluctant to come to this conclusion, as it relies on its opinion that the warden demonstrated bad faith, an opinion that, based on our prior jurisprudence, is irrelevant to our analysis.
When we remanded to the district court in Martin Marietta, we specifically acknowledged that discovery into the communications made between various entities and the decision makers would help a fact finder determine if bad faith existed. Martin Marietta, 675 N.W.2d at 557. I conclude the same thing here.
I acknowledge it is possible “that the only way there can be effective judicial review is by examining the decisionmakers themselves.” See Citizens to Preserve Overton Park, Inc., 401 U.S. at 420, 91 S.Ct. at 815-26, 28 L.Ed.2d at 156. But until the Ombudsman has exhausted its other avenues for investigation, piercing the privilege is not yet appropriate. What is appropriate is to allow the Ombudsman to depose Edwards on issues not relating to her mental process, which could include other communications, including with Sa-vala, the day she upgraded her sanction from a class “B” violation to class “A” violation. The video of the incident, missing from the appellate record, may also assist the district court in evaluating the severity of the incident. Even information about the quantity of hearings Edwards conducted and the corresponding number of reports she generated would help determine if it was likely she had made a clerical error in not upgrading the offense to a class “A” rather than a class “B,” or whether she acted improperly or in bad faith. On remand, the district court, guided by a more complete record, will be better positioned to decide whether a sufficient showing has been made to overcome the mental-process privilege.
V. Conclusion.
I would reverse the district court ruling compelling an unlimited deposition of Edwards. On remand, the deposition of Edwards should proceed with the Ombudsman allowed to inquire into various communications with relevant involved parties, and an exploration of the general procedures involved in handling prison discipline. However, Edwards would be entitled to invoke the mental-process privilege to decline to answer questions regarding her internal thought processes unless and until the district court, after reviewing the complete record before it, concludes the mental-process privilege has been defeated by evidence demonstrating a “strong showing of bad faith or improper behavior” on her part.

. The Board of Adjustment members were the decision makers in Martin Marietta.

. The director of the Iowa department of corrections shall develop policy and procedural rules to implement sections 903A.1 through 903A.3. The rules may specify disciplinary offenses which may result in the loss of earned time, and the amount of earned time which may be lost as a result of each disciplinary offense.
Iowa Code § 903A.4 (2009).

. I acknowledge we would not be punishing Edwards if we were to find she acted improperly or in bad faith, but it is not Edwards’s interests that are at stake here. I am interested in preserving proper procedure for overcoming the mental-process privilege. In order to follow this proper procedure, we are required to make an objective determination of Edwards’s intentions to find that she acted in bad faith.